Casey, Chief Justice,
delivered the opinion of the court:
The action is brought to recover $373,879 88, with interest from the 19th of May, 1820, and comes before us upon the following facts :
Between the Spanish convention of 1802 and the treaty of 1819 there had accumulated and were filed in the Department of State a large number of claims by American citizens against the government of Spain. Among them was the claim of Bichard W. Meade, an American merchant, resident in Spain, for $400,000. It differed from the others in this.: that while they were claims arising from spolia-tions and injuries which Spain neither acknowledged nor denied, this one was founded, though not entirely founded, upon contract, being in part for injuries suffered by illegal imprisonment, but chiefly for supplies sold to the Spanish government at various times of national trouble and distress, and which Spain considered she was, in honor and good conscience, bound to pay.
This distinctive fact is important as a fact because it was after-wards asserted that the former class of claims were srrch as a government is bound to investigate and enforce, while the latter, or Mr. Meade’s, was one voluntarily created by the party, and which a government only can take up and enforce at the request of and as the agent of the claimant.
The aid of the United States had been repeatedly invoked and had been repeatedly given, when, in June, 1818, Mr. Meade wrote to John Quincy Adams, the Secretary of State: “ It has been insinuated to me that if I could procure and advance a further sum in cash, that a cession of lands might be procured in either of the Florida's to cover the probable amount of said advance and my claims. No specific proposal has been made to me, nor have I dared indeed to listen to any, till I should receive the approbation of the President on the subject, as I have been led to suppose that th^ government'of the United States has required or said that no cessions of lands made after a certain date would be admitted, in case of the Floridas being ceded in sovereignty to the United States. Tet, as the subject, of the demand on those provinces, and their cession to the United States, if it should take effect, is designedly and expressly for the purpose of remunerating the citizens of the United States for injuries sustained or damages claimed by them from Spain, which is the precise nature of my claim, I conceive no objection could occur to the arrangement proposed. I have, however, abstained from receiving or making any formal proposal, till I should receive a specific answer from the President or you on the subject. Should I be fortunate enough to make an arrange *254 ment of the kind, I shall always he willing, if the government of the United States think proper to assume the grant made me, to give it up to them for a sum equal or equivalent to my demand on the government.”
But Mr. Adams replied, September 13, 1818: “It has been contemplated that means might be found by the cession of Florida for obtaining this satisfaction in a manner which may not he burdensome to Spain, which expectation will be disappointed if the property of all the vacant lands in the province should he granted by the King of Spain to individuals before the cession of the jurisdiction to-the United States. It is expected, therefore, that in case of the conclusion of a treaty, including this cession, all grants after a certain date to he agreed upon will be annulled.”
And Mr. Meade thereupoh abandoned any further attempt to collect his claim in this way, by procuring a grant in the Floridas, and on the 17th January, 1819, through his wife, and on the 20th January, 18Í9, through his counsel, John Sergeant, esq., submitted his claims upon Spain “for that protection which his government may think proper to grant.”
On the 22d February, 1819, the treaty with Spain was signed and immediately ratified by the United States. There were several provisions in it directly affecting the claim:
1. The treaty ceded Florida to the United States.
2. The high contracting parties (Art. 9) reciprocally renounced “all claims for damages or injuries which they themselves as well as their respective citizens and subjects may have suffered until the signing of this treaty’’
3. The United-States exonerated Spain "from all demands infuture on account of the claims of their citizens,” and undertook "to make satisfaction for the 'same to an amount not exceeding five million dollars.” (Art. 11.)
4. “ To ascertain the full amount and validity of these claims a commission, to consist of three commissioners, citizens of the United States,” was to he appointed, which should meet at Washington, “and within the space of three years from the time of their first meeting ” should “ receive, examine, and decide upon the amount and validity of all claims.” And it also was provided that they should “have power to examine all such persons as come before them on oath or affirmation, touching the complaints in question, and also to receive in evidence all written testimony, authenticated in such manner as they shall think proper to require or admit.”
*255 5. The treaty contained a renunciation on the part of the United States which covered, and was intended to cover, the case of Mr. Meade.
6. The ratifications of the treaty were to be exchanged within six months.
The claim of Mr. Meade, therefore, at the time of the signing of the treaty, came within its provisions and was provided for by it, precisely as all other claims' were provided for; and, moreover, this was understood, as it was desired, by the three parties interested, who at the time believed that the fund of $5,000,000 would be more than sufficient to pay this and all other claims.
The treaty, with authority to exchange ratifications, was committed to the charge of Mr. John Forsyth, our minister to Spain, on the 8th March, 1819. (4 Am. State P., 650.) But on the 10th March the Secretary of State wrote to Don Luis de Onis, the Spanish minister in Washington, relative to an article of the treaty which provided that all grants of lands in tlje Floridas made by Spain “since the 24th January, 1818, when the first proposal on the part of his Catholic Majesty for the cession of the Floridas was made,” were “declared and agreed to be null and void.” This date had been “ agreed to .on the part of the United States with a full and clear understanding that it included the grants alleged to have been made in the course of the preceding winter by the King to the Duke of Alagon, Count Puñon Eostro, and Mr. Yargas,” but which were in fact made previously. The Secretary of State therefore requested an acknowledgment of this statement from the Spanish minister, and on the same day instructed Mr. Forsyth “ to explain and declare, upon the exchange of the ratifications,” that it was done “with a full and clear understanding between the plenipotentiaries of both the high contracting parties” that these grants were “ among the grants thus declared nulj. and void.”
On the part of Spain there was a refusal to ratify the treaty, and General Francisco Yives was sent out as envoy extraordinary “ to request certain explanations relative to the future policy of the United States, which,” he stated in his first official note to the Secretary of State, (4 Am. S. P., 680,) “were motives of sufficient weight imperiously to dictate the propriety of suspending the ratification ef the treaty, even although the American envoy had not at first announced in the name of his. government, and subsequently required from that of Spain, a declaration which tended directly to annul one of its most clear, precise, and conclusive articles” The period within which the ratifications were to have been exchanged consequently expired with *256 out Spain baying ratified tbe treaty, and Mr. Forsytb, on tbe 21st August, 1819, (4 Am. S. P., p. 661,) notified tbe Spanish government that “as the ratifications of the convention of tbe 22d February will not have been exchanged, all tbe claims and pretensions of tbe United States which, with tbe spirit of moderation, the love of peace, and tbe delusive expectation that all causes of difference and dispute with Spain would be thereby adjusted and settled, they consented to modify or waive, will stand in the same situation as if that convention had never been made ; and the United States will hold themselves free to press and enforce them in any and every mode, consistent with honor, that their interests may require.”
Before tbe signing of tbe treaty, on tbe 18th January, 1819, tbe American minister at Madrid bad transmitted to the Spanish government two memorials of Mr. Meade, relating to bis claim, and requesting that tbe King would “appoint a commission to liquidate tbe several demands which Mr. Meade has against the government on account of supplies furnished for the support of its armies and otherwise during tbe late war, as well as to consider tbe compensation due to him for bis losses and personal sufferings under a late, proceeding of tbe council of war, already declared by his Majesty to have been illegal,” and in this request tbe American minister joined. On tbe 7th May, 1819, tbe King also bad appointed a commission, consisting of tbe minister of the Council of tbe Indies, tbe fiscal “of tbe Council of Finance, the senior minister of tbe comptroller general’s department, and a clerk of tbe secretary’s office of the finance department, and bad charged them with tbe settlement of all tbe claims and compensation that might result from Mr. Meade’s documents.
On the 18fch May, 1819, this commission had notified Mr. Meade that they were prepared to receive bis proofs and bear his explanations.
This was tbe condition of affairs when the time for exchanging ratifications of tbe treaty expired, and the American minister notified Spain that all tbe claims of the United States would stand “in the same situation as f that convention had never been made.” Subsequently to this notice, on tbe 31st August, 1819, the royal commission called on Mr. Meade for the “ original documents” establishing bis claims, and on tbe 1st and 19th September Mr. Meade transmitted them to tbe commission. These original documents were regarded by Spain as the vouchers of Mr. Meade’s accounts ; they were accordingly placed in tbe archives of tbe Spanish government and have never been restored to him or to the United States.
Tbe royal commission or junta made an award upon the claim, or *257 rather upon the various claims of Mr. Meade. They compromised his claim for personal injuries by reducing it from 8,500,000 reals to 5,461,500 reals; they allowed the amount the proofs established upon his commercial transactions; and they added interest thereon, “ calculated, down to the date of the liquidationThe King approved the award on the 19th May, 1820; the junta “extended in legal form a certificate ” to Mr. Meade, and the award became final and conclusive against Spain.
This fact was reported to the United States through two channels. On the 10th June, 1820, the Spanish secretary of state wrote to the American minister at Madrid as follows :
“ Sir : I have the satisfaction of informing you that the Spanish government, always upright and honorable in its decisions, has determined to acknowledge, with the sanction of Ms Majesty, Don Richard Meade, a citizen of the United States, its creditor for nine millions eight hundred and twenty-three thousand and seventy-two reals vellón and llmaravedis; for which a competent security, in writing, has been given him.
“As your government, sir, has taken part in the fortune of this individual, I hope you will he pleased to communicate this favorable determination to the President of the said States, inasmuch as the respect which he deserves has had much influence in it; and also the hope that Spanish subjects may, by a just reciprocity, find equal protection and consideration in the United States.”
Mr. Forsyth replied, (June 29th:)
“Sir: I have had the honor to receive your excellency’s note of the 10th instant, wherein it is stated that your government had liquidated the claim of Richard Meade, a citizen of the United States. I shall, as your excellency requests, communicate this information to the government of the United States, which receives with pleasure every indication of good will from that of his Catholic Majesty.”
And he communicated a copy of these notes to the United States.
On the 17th August, 1820, Mr. Meade wrote to the Secretary of State:
“ Sir : I beg leave to transmit herewith for your information and that of the President, (if you will please to communicate them to him,) three documents received by me from the Spanish, government, relative to my claims, their final liquidation, and the ackowledgment of the sum due me hy the Spanish government. A perusal of these documents will, I trust, convince the President and yourself that the *258 interference of the government has not been bestowed on a person unworthy of the high protection he has received.”
To this Mr. Adams replied, (September 6, 1820 :)
“ SiR: The acknowledgment of the receipt of your letters of the 10th aud 17th ultimo has been thus long accidentally delayed. In making it now it gives me pleasure to offer you my congratulations upon the adjustment of your accounts with the Spanish government, and to assure you that this government feels not a little gratification in having at all contributed to the satisfactory result.”
Such was the condition of the claim, when in August, 1820, the constitutional government of Spain resumed the consideration of the treaty. The constitution of 1812 had been re-established, and the general Cortes restored on the 10th March, 1820. Under this constitution the King could not ratify the treaty without the assent of the Cortes, nor could he cede the public lands of Spain. The Cortes assembled on the 7th July, 1820, and the subject of the treaty was referred subsequently to a special committee. A memorial had been sent previously to the Cortes by Mr. Meade, bearing date the 20th June, 1820, which claimed an appropriation for the sum acknowledged to be due to him by the King. The same committee reported to the Cortes that it was necessary to ascertain whether the amount due to Mr. Meade had been included among those claims which the United States had undertaken to pay, and from which it was wholly to exonerate Spain, and that if this had not been done, then the debt in particular ought to be paid, as it was a national debt arising out of contracts made by him in aid of the liberty and independence of Spain at the most critical periods of the revolution. (4 State Papers, Foreign Relations, p. 726.) In consequence of this report it was proposed that the Cortes address a letter to the Spanish Secretary of State to ascertain whether or not the debt had been included among those which the United States undertook to discharge. Such a letter was accordingly written by the secretary of the Cortes, and a reply from the secretary of state was received stating distinctly that the debt was expressly included in the treaty, and that the nature and amount of the debt had been officially communicated to the American minister. But in order to prevent any possible misunderstanding or mistakes on this subject, a committee of two members was appointed by the Cortes to wait upon the American minister and ascertain the views of his government. Mr. Forsyth did not understand that the members called upon him a3 a committee, but he gave them a “clear atid distinct assurance that the debt due to Richard W. Meade would certainly *259 be -paid to him by the United States, if ike treaty were ratified by the Spanish government, and the cessions [to tbe Duke of Alagon and tbe Count Puñon Rastro and Mr. Vargas] totally annulled.’' Upon tbe faitb of these assurances thus conveyed to the Cortes, that body, after annulling tbe three private grants, ratified tbe treaty, and the Floridas passed to tbe United States. (Id., p. 727.)
■ It was now supposed by all of tbe contracting parties that tbe debt bad been assumed by tbe United States. But it had been discovered that tbe aggregate of the claims against Spain would far exceed the amount of $5,000,000, which limited tbe liability of tbe United States. Tbe treaty bad yet to be confirmed by the American government, inasmuch as its tardy ratification by Spain was a violation of the terms which bound both parties; and Mr. Meade therefore addressed a memorial to tbe President, which was transmitted by him to the Senate.
By this memorial Mr. Meade clearly and distinctly notified tbe President that tbe Cortes bad decreed tbe assumption of tbe debt by tbe American government, or its immediate payment by Spain; that tbe claim bad been a subject of express negotiation between tbe two governments; that the 5th renunciation bad been introduced into tbe treaty by Spain for tbe express purpose of providing for this-debt; and that tbe Spanish government bad been assured, and believed, and were warranted in concluding, that “they were to be as effectually exonerated and discharged from their debt” to him “as if it had been mentioned by name in tbe treaty.” He also said : “The terms of tbe treaty, taken simply and strictly, without being interpreted by any such supplemental arrangement or understanding, clearly import that all tbe claims embraced by all tbe five renunciations on tbe part of the United States are to be thrown into one heterogeneous mass and placed on tbe same level, and subject to tbe same rule of compensation. Whereas nothing could be more unjust and injurious than such an operation in regard to my claim, because nothing can be more dissimilar in their nature, in their origin, and in all their circumstances, and nothing more unequal in tbe cogency of tbe legal and moral obligations out of which they arise, than my claim and tbe mass of others with which it is apparently confounded.”
“All that can be required to make out my case is this brief and simple statement of it: My property, to tbe value of nearly half- a million, is taken to pay for the Floridas. Then upon any principle of-public law or of a constitutional bill of rights, what is there to cast the shadow of a doubt over my claim to be compensated and reimbursed that instant tbe cession of tbe Floridas is consummated ?”
*260 And be finally requested tbe Senate “to annex to tbe ratification of tbe treaty, by way of rider, a distinct recognition of my claim, so that it may be specifically provided for, among tbe appropriations necessary to carry the treaty into effect, or to have tbe fifth renunciation distinctly exce-ptcd from the ratification and expunged from the treaty ; or at least, to have my claim excepted from it by name
And with perhaps a prophetic sense of what was to follow, be added:
“ 1 have tbe most assured confidence that Spain, when tbe moral sense ' and good faith of tbe nation are no longer perplexed by tbe salvo of that renunciation, cannot resist one moment my instances for an immediate liquidation of tbe debt. In all events, it is my clear and decided election to abide the issue of such an appeal to the moral sense and good faith of that nation, rather than the chances of that contingent .and long-deferred indemnity, provided for the other claims.”
The Senate did neither tbe one nor the other, but on tbe 19th February, 1821, accepted and assented to tbe treaty as ratified by Spain, ¡leaving Mr. Meade to pursue tbe only remedy which it gave.
We have now to inquire as to the fate of this claim under tbe treaty. 'The commissioners who were to ascertain “tbe amount and validity” of tbe claims met and organized at Washington on the 9 th June, 1821. ■On tbe 6th January, 1822, Mr. Meade filed with them a memorial in •which he states that be has been personally informed by tbe Secretary • of State, and officially advised by tbe Spanish government, since tbe ratification of tbe treaty, that bis claim was intended to be, and in fact •.is, included in tbe ninth article. He also gives a history of tbe claim, .and hopes to have established certain conclusions beyond doubt or , controversy, viz :
1. That tbe United States bad no power to release tbe debt due •from Spain “upon any other terms but tbe payment of tbe debt as guarantee of Spain; in other words, that tbe treaty-making power is per se utterly incompetent to exert its jurisdiction over tbe rights of a . creditor claiming a mere pecuniary debt.”
2. “ That no authority whatsoever has, in fact, been supplied by tbe agency or consent of tbe creditor, who, in point of fact, has never com¡mitted .bis claim to tbe management or discretion of tbe government' any further than to invoke tbe interposition of tbe good offices of tbe American government in aid of tbe claims and petitions, which claims . and petitions, in all instances, went tbe length of demanding full and complete satisfaction.”
3. “That the claim is, nevertheless, comprehended in tbe 5th renunciation, in virtue of .which, connected with tbe express stipulation in *261 the 11th article, the United States are absolutely and unconditionally bound, in consideration of a valuable equivalent received of Spain, to exonerate her from the debt, and by that means have interposed a bar to remedies otherwise clear and indisputable, by which the creditor' might have secured his debt from the original debtor.”
4. “That by the force and effect of these stipulations the public faith of the United States is solemnly pledged equally to Spain, as the debtor, and to your memorialist as the creditor, to discharge the debt without defalcation or delay, and without reference to the stipulated and limited fund provided by the treaty.”
The memorial then concludes with a prayer that the commissioners “will proceed to investigate the circumstances of his claim, in order that it may be officially decided and promulgated what provision is intended for your memorialist by the treaty, that is to say:
“ 1st. Whether his claim be not clearly comprehended in the list of renunciations declared on the part of the United States in the 9th article of the said treaty.
“2d. Whether, being so comprehended, your memorialist be not clearly entitled to a substantive and full satisfaction of his claim, whatever may be the pro rata allowance to the general mass of claimants out of the specific fund provided by the said treaty.”
The first determination of the commissioners was to reject the claim because it was for acts performed under.contract, “ which he could not have performed without transgressing the acknowledged belligerent rights of other nations,” acts “which would have required the United States to abandon such citizen to the state of war without making any reclamation on his behalf.” But by a communication bearing date the 5th March, 1822, the commissioners submitted this opinion to the Secretary of State, and said :
“As such a construction, if contrary to the intent of the high contracting parties, as is suggested, may possibly impair the faith of the United States and lead to consequences violating even their peace, the commissioners beg leave to submit to you the propriety of adopting some course which may bring before them any document or suggestion by which the object and intent of the United States in concluding the treaty may be disclosed more fully than they are now exhibited by the article before mentioned.
“ If the President is content to adopt that construction of the treaty which the commissioners, as at present advised, are disposed to give it, no suggestion need be made to them. But if this should not be the case, as nothing will most probably operate to change the opinion *262 which the commissioners are disposed at present to entertain upon this subject but a clear communication that such a construction would he violative of the intention of the high contracting parties, it will he necessary that a communication to this effect should be made to them.”
On the 9thMarch, 1822, the Secretary, by direction of the President, officially replied :
“ In providing for the claims of the citizens of the United States upon Spain, by the treaty of the 22d February, 1819, it was not understood or intended by the government of the United States, nor, as is believed by the other party to the treaty, that claims arising from contract, as they existed at the time of the signature of the treaty, should be excluded from the benefit of the treaty. The claims intended to be provided for were those specially enumerated in the renunciations, and embraced all claims, statements of which, soliciting the interposition of the government, had been presented to the Department of State, or to the minister of the United States in Spain, since the convention of 1802, and until the date of the signature of the treaty."
The Secretary of State went still further, and virtually instructed the commissioners as to the construction to be given to the treaty, so far as regarded the proceedings in Mr. Meades’s case and the nature of the proofs to be required, for he said :
“ Whether, among the contracts provided for, there were some upon which the government of the United States, but for the treaty, must have eventually abandoned the claimants to the fate of war was never a subject of inquiry. Those claims, it is presumed, were not the less valid against Spain, nor were their prospects of real satisfaction by Spain in any other manner believed to be different from the rest. The government was, indeed, aware that the abstract right to its interposition of citizens who had suffered by acts of foreigners, without any co-operation of their own, was more clear and imperative than that of others who had voluntarily staked their property upon the good faith of Spain; and, in the course of the negotiation, a proposal was made to omit the renunciation which included the latter class of these claims. It was, however, finally agreed to, with the full understanding that all the claims should have the same benefit of the provision, be subjected to the same investigation, and be decided upon, not by any subsequent transaction between the claimant and the Spanish government, but by the commissioners, in the manner prescribed by the treaty, and upon such proof as they should think proper to require for ascertaining its amount and validity.”
On the 16th April, 1823, the commissioners, through their president, *263 Judge White, delivered an elaborate opinion, by which they determined to continue the case, and to call upon Spain for the original proofs and documents of her indebtedness to Mr. Meade, and in which they expressly held with regard to the liquidation and settlement of the claim by Spain, “ That no person, either natural or artificial, can, by his acknowledgments or admissions, create an obligation to be discharged by and at the expense of another, unless that other has, by some means, authorized him to do so. If Spain did not owe this debt to Mr. Meade at the date of the treaty, but contracted it afterwards, it is not one of those renounced, and Spain is still responsible for it, not the United States; and ought therefore to be rejected, because it would prove a fact which would avail nothing. If Spain did owe it at the date of the treaty, there must have been some evidence then existing of the demand, for which the extent of liability could .be ascertained. That evidence would he better than the mere settlement with the Spanish officers, and ought to he produced.”
As the proceedings to procure that evidence constitute a distinct branch of the case, we may add here that it never was procured; and that on “ the 39th day of May, 1824, as appears by the journal of proceedings, the claim set forth in the memorial on the part of the said Riehard W. Meade was by the said commission rejected, on the alleged ground that the evidence produced was not sufficient to establish the same.”
On the 8th June following the commission expired. “ The full amount of the sums allowed to the different claimants” by the commission was “$5,454,545 13, while the treaty limits the extent of the liability of the United States 1 to an amount not exceeding $5,000,000.’ ” So that the commission found it necessary “ to abate each claim allowed pro rata 8J per cent.” The fund thereby was exhausted, and Mr. Meade left without redress.
The treaty contained this express stipulation: “The Spanish government shall furnish all such documents and elucidations as may be in their possession, for the adjustment of the said claims, according to the principles of justice, the laws of nations, and the stipulations of the treaty between the two parties of 27th October, 1795; the said documents to be specified, when demanded, at the instance of the said commissioners.”
During the months of October and November, 1822, Mr. Meade had filed with the commissioners two supplemental memorials. In the first of these “ he prays the commissioners, in case the originals of any documents of public acts in Spain should be wanted, where he has *264 only annexed copies, or in case any other documents are wanted to elucidate bis claim, to call for them from the Spanish government, according to the provision of the eleventh article of the treaty.” And in the second he “ respectfully suggests, that if it will be deemed right and just, though he confidently hopes it will not, to regard the Spanish liquidation as wholly null, and to revise its foundations and proofs, a resort must be had to the eleventh article of the treaty, which points out the course to be pursued in all similar cases; a course mutually agreed upon by the United States and Spain, which the commissioners alone are competent to take, and the only one from which a satisfactory result can be reasonably expected.”
The decision of the commissioners upon these memorials, which has been before quoted, was not rendered till the 16th April, 1823. On the 17th Mr. Meade filed a list of the documents required from Spain, and on the 18th the commissioners transmitted their application to'the Secretary of State.
This application of the commissioners was given to Mr. Nelson, the newly appointed minister of the United States, on the 13th May, .1823, with written instructions by the Secretary of State. Mr. Nelson was then at Washington, and his first communication to the Spanish government respecting the application bears date at Madrid, the 19 th December following, and the first intimation which he gave to Spain that any documents would be wanted in this case was on the previous day, (letter to Mr. Adams, 26th December, 1823.) But a previous application for documents relating to other claims was then pending. On the 8th March, 1824, the Conde de OfMla, the Spanish Secretary of State, in regard to all of these applications, replied :
“ His Majesty being informed, he commands me to say to you that the papers of this office (secretaria) have been thrown into great confusion by their removal to Seville and Cadiz, whence they are expected in a few days. As soon as they shall arrive, we will proceed to search for those which yon demand, and all those originals whose delivery may not be inconvenient shall be at your disposal; those, also, which are found to be not of this character shall be furnished, that true copies of them may be had, conformably with the treaty.” The papers never were furnished, though, as appears by a letter from Mr. Nelson to the Secretary of State, bearing date the 31st July, 1824, “ the Spanish officers” entered into the work “ apparently in good faith to supply them.” (4 Am. Stat. P., p. 731.) This was after the commission had expired.
But before the claim was submitted to the commission, Mr. Meade *265 wrote to the Spanish minister at Washington, (January 2, 1822,) protesting that, “ being compelled by the treaty between Spain and the United States to have recourse to the latter for the payment of his credit,” he still reserved his right (in case of not obtaining it in whole or in part from the United States), against Spain; and requesting that this protest be transmitted to the Spanish court. The minister replied on- the 11th January, 1822, (4 Am. Stat. P., p. 729,) that he had “ lost not a moment in transmitting to the Spanish ministry a copy of the letter, and he proceeds to reassure Mr. Meade by saying:
“ When his Catholic Majesty decided on making the sacrifice of such important provinces as those of the Floridas, it was with the object of satisfying in full, and without any deductions, the credits which the citizens of the United States might have against Spain.” “ This is so much the more true” (he proceeds) “ as relates to your credit, as it is of a distinct character from all the others. It is the only one which, after the most scrupulous or minute investigation, has been liquidated and acknowledged by Spain; the only one, for the same reason, that does not require the examination of the commissioners; and the only one, in fine, on which there can be no cavil or discussion.”
After thus notifying the Spanish government of the course he was compelled to pursue, but more than a year before the decision of the commissioners of April, 1823, Mr. Meade transmitted to the Spanish minister at Washington (April 4, 1822) the letter from the commissioners to the Secretary of State, (March 5, 1822) and his reply, (March 9, 1822,) which have been previously cited, and he at the same time preferred to the minister this request: “ To obtain for me all documents, vouchers, and evidence whatsoever in the possession and under the control of Spain appertaining to my demand, that I may prepare them, in case of need, for exhibition to the commissioners.”
On the 10th October, he renewed this request, and on the 16th of the same month the Spanish minister replied :
“ I have been surprised beyond measure at what you are pleased to impart to me respecting the determination of -the commission, and I flatter myself that it will not persist therein when it reflects on the injustice it involves and' on the libel it imports on my government. The duty and the wishes of the commission in the examination of your claim can have no other object than that of convincing itself of its justice in order to adjudicate to you its amount. To obtain this it ought to require of you the presentation of the most authentic documents known to the country in which your claim originated; and if you exhibit these, and prove them to possess the highest character of *266 authenticity, and that they are sanctioned by the established tribunals for such purposes in that country, and by those persons to whom, as the beads of that government, entire credit should be accorded, no corporations or individuals existing of higher grade, or in whom greater confidence can be placed, it is obvious that the commission cannot ask for evidence more satisfactory.”
He then proceeds:
“ The liquidation made of your demands by the Spanish government took place at the particular instance of the minister of the United States at Madrid; it was not the work of persons selected by the ministry of Spain, but of its most respectable tribunals ; it was not investigated by one alone, but by various commissions, composed of individuals of the strictest probity, of the highest rank, and of no disposition to favor you; and, finally, after the most rigorous examination, it received the sanction of the King himself. It is also well worthy of remark that when all this was effected, it by no means appeared that the United States would assume to pay this debt; and when the liquidation which had been accomplished was communicated by the minister of state to the minister of the United States at Madrid, he not only did not make any objection to it, but in the name of his government returned his thanks and manifested every satisfaction with it. This liquidation, thus sanctioned by his Catholic Majesty, and admitted and approved by the minister of the United States, is the one which you present to the commission. And what document can my government give you that would be more conclusive ? Will the commission place greater faith in the authentication of a notary public, or of a merchant, than in the attestation of the Council of Finance, the supreme tribunal of auditors, the Treasurer General, the Minister of Finance, or, in a word, the King himself?”
And the minister then concludes : The Spanish government will regard as a serious insult that what in Spain is acknowledged as most sacred and respectable, should here be pronounced of no value; that it will never consent to have questioned the legality and purity with which your liquidation was made, and which is accompanied by all the marks of authenticity which it can give; and in fine, though it should he practicable to reunite all the documents upon which that liquidation w&s made, his Catholic Majesty knows too well what is due to his own dignity, to the reputation of his ministers, and to the integrity of his tribunals, to consent that a foreign commission shall deem itself authorized to revise their decrees.”
In this communication the Spanish minister raised no objection to *267 the form or manner of the application, or to the fact that it did not come from the commissioners, or through the government of the United States, but made it absolute and unconditional, and his refusal went directly to the merits and substance of the application.
This refusal on the part of the minister received the approval and became the act of his government; for, on the 15th of April, 1823, his successor addressed a note to the American government, in which he says :
“ His Majesty has been pleased, to approve and sanction said answer of my predecessor to Mr. Meade, and he further commands,me to support his reclamations, and represent to your excellency, in the most friendly hut at the same time in the most forcible and solemn manner, against every opposition that may be pretended to be set up with a view of not paying the private debt which the aforesaid Meade holds against the Spanish nation, but which, in virtue of the late treaty, has been assumed by the government of the United States.”
And in what appears to be a postscript to the same communication, he adds:
“ I have the order of my government to manifest to you that it cannot remain silent when it is endeavored to place in doubt an act so undeniable; and I beforehand solemnly and respectfully protest against any division of the commissioners named in virtue of the treaty that may in any manner invalidate the acknowledgment made by my government of the total debt of Mr. Meade, agreeable to the certificate which has been furnished him, and which he has in his possession.”
It must now be borne in mind that the liquidation of Mr. Meade’s various claims by the Spanish government, and the royal decree for the payment thereof, were subsequent to the signature of the treaty, and also that the treaty provided only for claims that had accrued between the convention of 1802 and its own date of February 22,1819. Therefore, if that liquidation and decree constituted a legal novation of the debt so as to take it out of the terms and intent of the treaty, it is evident that it remained a legal debt from Spain. It must also be borne in mind that the Spanish government were bound by the treaty “ to furnish all such documents and elucidations as may be in their possession for the adjustment of the said claims,” and that they had once positively refused to furnish the documents relating to Mr. Meade’s claim, and had at best failed to do so. Mr. Meade might, therefore, have had a claim against Spain founded upon the award of the junta, or upon her refusal to furnish the documents when requested by himself, or upon her neglect to do so when requested by the United *268 States. Between tbe rejection of bis claim by tbe commission of 1824 and tbe convention with Spain in 1834, all of these facts were pressed upon the attention of both tbe President and Congress by various memorials, and were tbe subject of at least five reports by congressional committees ; yet,nevertheless, on tbe 17th of February, 1834, tbe United States united in a convention with Spain, whereby Spain “ engages to pay to tbe United States as the balance on account ” of “tbe claims preferred by each party against the other,” “ the sum of twelve millions of reals vellón, in one or several inscriptions, as preferred by tbe government of tbe United States.” “ And said inscriptions, or tbe proceeds thereof, shall be distributed by tbe government of tbe United States among the claimants entitled thereto, in such manner as it may deem just and equitable.” (Art. I.) In consideration of these stipulations tbe United States, as one of “the high contracting parties,” “ reciprocally renounce, release, and cancel all claims which either may have upon the other, of whatever class, denomination, or origin they may be, from the 22d of February, 1819, until the time of signing this convention.” (8 Stat. L., p. 460.)
After tbe rejection of bis claim by tbe commissioners, Mr. Meade applied to Congress for payment of it, and continued to press it upon tbe attention of tbe government by every means in bis power until bis death, in 1828. His widow and executrix neglected no opportunity or method of keeping it, before Congress until she also died, in 1852. Tbe eldest son of tbe claimant, Captain R. W. Meade, then became tbe representative of tbe estate, and has manifested tbe same persistence and diligence in urging tbe satisfaction of tbe claim which characterized the unsuccessful efforts of bis parents.
Tbe history of tbe claim in Congress it is unnecessary to pursue, except to state generally that in tbe thirty years it was before tbe two bouses of Congress it received tbe support of many, and encountered tbe opposition of some, of tbe ablest minds of tbe nation. A number-of reports of committees in both bouses were made in favor of its payment; several against it. It was supported by reports from Mr. Forsyth, Mr. Archer, Mr. Porter, Mr. Ingersoll, Mr. Everett, and Mr. Buchanan. It encountered tbe opposition of Mr. Clayton, Silas Wright, and others. Out of Congress it was sustained by tbe opinions of such eminent counsel as Mr. Clay, John Sergeant, and Horace Binney. A number of times bills for its payment or adjustment passed one house of Congress, but failed in tbe other, either for want of time or lack-of votes.
After tbe establishment of tbe Court of Claims, 11th of February, *269 1856, tbe Senate, by resolution, referred the claim to the court for adjudication, and on the 17th of October, 1859, a decision was rendered by two of three judges then constituting the court, adverse to the claim. At that time the decisions» of the court were reported to Congress, and consequently the claim went back and received the further consideration of Congress. On the 27th of February, .1861, another resolution passed the Senate, transmitting it for a second time to this court. But before a second trial took place the act of 1863, reorganizing the court, was passed. Proceedings were then taken by the Solicitor of the United States to dismiss the case, upon the ground that the Senate alone had not power to re-refer a case which had been reported to and was pending in Congress. But before any action was taken on this motion Congress passed the joint resolution of July 25, 1866, (14Stat. L.,) which is as follows :
“Whereas doubts are entertained whether the claim of the estate of Richard W. Meade, deceased, upon the government of the United States, is covered and embraced by the ninth section of the act of third March, eighteen hundred and sixty-three, entitled ‘ An act to amend an act to establish a court for the investigation of claims against the United States,’ approved February twenty-four, eighteen hundred and fifty-five, which case was referred to the said court by resolution of the Senate, passed twenty-seventh February, eighteen hundred and sixty-one: Now, in order to remove all doubts on that subject,
“Resolved by the Senate and House of Representatives of the United States of America in Congress assembled, That the said claim of Richard W. Meade, administrator of Richard W. Meade, deceased, be, and the same is hereby, referred to the Court of Claims for, adjudication thereof, pursuant to authority conferred upon said court by any existing law to examine and decide claims against the United States, referred to it by Congress.”
At the present term the case has been reheard and fully and ably argued by the eminent counsel of the claimants on the one side, and the Assistant Solicitor on the other. The judges have given to it a long, careful, patient, and anxious examination and consideration. On a question of so much importance, it is to be regretted that their views and opinions should not entirely harmonize. Under these circumstances, we do not feel like entering upon any discussion of the great principles involved in the case. They have been exhaustively treated in the diplomatic discussions on the subject between the United States and Spain; in the opinions delivered by the commissioners under the treaty; in the memorials of the claimants presented to the President, *270 the commissioners, and to Congress, prepared by counsel of great and commanding eminence; and by the reports and discussions in the two houses of Congress, written by and participated in by gentlemen of the highest attainments as publicists, statesmen, and lawyers.
In view of these facts, we do not feel called upon to enter upon any extended or elaborate discussion of the great principles involved in the case. Having carefully collated the 'facts, and concisely and briefly stated our conclusions upon them, the case will be in position for review before the Supreme Court of the United States, whose judgment alone can finally and authoritatively settle this long and difficult controversy.
The claimant’s counsel have rested his case mainly upon the following propositions: ,
I. That Meade, the claimant’s intestate, had valid claims on the Spanish government prior to the 22d February, 1819, originating after the year 1802 ; and that the United States, for a valuable consideration received from Spain, released her from the obligation to pay claimant, upon certain terms and conditions neither authorized by nor assented to by Meade.
II. The validity and amount of these claims were liquidated and adjudicated by Spain at the instance and by the aid and intervention of the United States, under circumstances which make that adjudication evidence against the United States, liable only to be impeached for fraud and collusion between Meade and Spain.
III. That under the facts of this case, the renunciation and release of the claim by the United States to Spain was a taking of Meade’s private property for public use, which entitles him to just compensation outside and irrespective of the treaty, and of which the commissioners under the treaty had no jurisdiction, and to the recovery of which their proceedings and decision interpose no bar.
IY. That the failure of the United States to enforce the production of the documents and evidence required by the commissioners from Spain in due season, was such a breach of the duty assumed in the treaty, to the injury of the claimant, as renders them liable for the loss sustained.
The solicitors for the United States, on the other hand, contend:
I. That the only liability ever assumed by the United States, either to her own citizens or Spain, was by the treaty, and that her obligations are to be measured by and determined under and according to the provisions of that instrument.
II. That the assistance afforded Meade, as matter of grace and *271 favor, did not make tbe United States either a party or privy to tbe liquidation of tbe claim, so as to make the adjudication evidence against them under tbe treaty.
III. That Meade’s claim having been included in tbe treaty at bis own solicitation, be thereby voluntarily subjected it to tbe compromises and adjustments provided for other individual claims by tbe treaty.
IV. That in tbe renunciation and release of Meade’s claim to Spain, there was no exercise of tbe right of eminent domain by tbe United States, nor was there tbe taking of any private property for public use; but an agreement by tbe United States, with the acquiescence, legal or actual, of tbe claimants, to assume such claims against Spain, to tbe extent and in the manner stipulated in tbe treaty.
Most of tbe difficulties that have attended this case originated in what we deem a mistake of tbe commissioners under this treaty. They applied tbe strict, rigid, technical rules of. evidence that belong to tbe administration of municipal or criminal justice, in the adjustment of these international affairs, to which they were inappropriate. The engagement of nations, tbe adjustment of their claims upon each other, or those of their respective citizens and subjects, should not, and for obvious reasons cannot, be subjected to the narrow technical rules of ordinary tribunals.
On tbe 22d February, 1819, the evidence leaves no room for doubt, the claimant’s intestate had a large and valid claim on the Spanish government. Prior to that date he bad notified the United States, of which he was a citizen, of its existence, and claimed their assistance and good offices in obtaining satisfaction of it.
The claim as it then existed is plainly described by and embraced in the treaty of that date. Tbe 5th renunciation by the United States, in the 9th article of tbe treaty, comprehended Mr. Meade’s claim. By tbe 11th article, these claims, as against Spain, were to be considered as “entirely cancelled, the United States undertaking to make satisfaction for the same,” as therein provided. The final ratification of the treaty was delayed for nearly two years, instead of being exchanged within six months, as agreed upon in the treaty itself. In the meantime Mr. Meade, by his own exertions and through the favor and good offices of the United States, was earnestly pressing the adjustment and payment of his claims upon Spain, no one knowing what might or would be the fate of the treaty. His partial success in this matter proved to be his greatest misfortune.
The commissioners under the treaty refused at first to consider the case within the treaty, regarding it as a new and different claim from *272 that provided for by its terms. Yielding that, they refused to receive as evidence the decree of adjustment and liquidation of the commission or junta.
We think this was a serious error. It was beyond all controversy the same claim that Mr. Meade filed with the Secretary of State in 1819. The evidence of that was not only convincing but conclusive. The decree and certificate were excluded because res inter alios acta, and which I venture to doubt has any place, or at least any such application, in international affairs. There was no doubt of the jurisdiction and competency of the court, either as to the parties or the subject-matter. The proceedings were invested with all the formalities and solemnities incident to a judicial decree. As between the parties and privies, it was like the judgment of any other court of exclusive jurisdiction, as a plea bar, and as evidence conclusive upon the same matter, coming either directly in dispute or incidentally in question between such parties or privies in another court for a different purpose. (Chief Justice De Grey, in the Duchess of Kingston’s case, 11 St. Tr., 261.) In The United States v. Arredondo, 6 Pet., 691, in a case arising under this same treaty, the Supreme Court of the United States held that “ an inquisition having been taken under the Spanish authorities, by which it was found that the Indians had previously abandoned the lands granted, this was held to be res judicata.” The only question could be whether the United States stood in such privity to the proceedings as made the judgment evidence before the commission. The solicitor for the United States insists they did not. So the commissioners decided. In ordinary judicial proceedings it is not necessary that a person should be an actual party on the record to make the determination evidence against him. Sureties and guarantors are sometimes concluded by judgments againts their principles, and e converso. So a judgment rendered against a tenant or bailiff may in some cases be given in evidence against the landlord or master in other suits where they had due notice of the former actions. Where one man agrees with another that he will pay the debt of such other due to a third party, the creditor brings suit against his debtor, the latter notifies the party assuming the debt, he participates in the suit, or may do so. Can it be doubted that he would be bound by the judgment 1 Or in case the original debtor pays the amount recovered and brings suit against the party making the assumption, is it not perfectly clear that the recovery would be not only evidence against him, but actually conclusive 1 How does this case differ in principle from that supposed ? Here, as between Spain and the United States, the latter *273 assumed to pay the debt owing by tlie former to Meade. He presses bis suit against Spain. His efforts are seconded by tbe United States. They have full, clear, aud distinct notice. Upon what principle, then, are they exempt from the ordinary rule of being bound in such ■ease 1 Upon even the narrow, technical rules applied by the commissioners the decree qf liquidation was evidence. I think it should have been conclusive.
For our purpose it is not necessary, nor do I deem it proper, to apply such rules in affairs of international concern. As the solemn judgment of a judicial tribunal of a foreign nation with whom we were on terms of peace and amity, it was at least prima facie evidence of the matter it adjudicated. Both international law and comity gave it this effect, if no more. It was evidence in the first place that Spain owed Meade the amount found due. (Westlake’s Priv. Int. L., p. 375 et seq.; Franklin v. McGusty, 1 Knapp, 274; Ricardo v. Garcias, 12 C. & F., 368; Ostell v. Le Page, 2 D. M. G., 895; Henderson v. Henderson, 6 Q. B., 735; Ranh of Australasia v. Nias, 16 Q. B., 735.) Like all other judgments, it was liable to be impeached for fraud. But it would be a rash and unfair presumption that Spain and Meade had entered into collusion to defraud the United States, especially as it was uncertain at the time of the liquidation whether the treaty ever would be finally ratified.
So far as the immediate parties to the treaty were concerned or affected, the United States and Spain, the ratification related back to the signing of it, and it took effect from that date. But as to the rights and interests of third parties, it affects them only from the time of the final ratification. (United States v. Arredondo, 6 Pet., 691.) As the treaty conferred no rights upon Meade until its ratification, so it could impose no obligations or restrictions upon him. The release and cancellation of the claim in favor of Spain only became operative at that time. Until then her obligations to Meade remained in full force. He had no claim whatever upon the United States in respect of his debt against Spain. He could have compromised with and released Spain from the debt. And such a release would have discharged both Spain and the United States and debarred him from all participation in the fund provided by the treaty. So if Spain had paid the debt. Phe rejection of the decree of liquidation assumes what cannot be maintained, that the treaty binds those whose claims were provided for by it from its date instead of from its ratification.
Nor do I think these positions are at all shaken by the fact that the treaty itself provided that the commissioners should have the *274 right to determine the validity and amount of the respective claims. Without that provision they would have had .the same power, But the ascertainment of those facts must he understood to he by the usual and ordinary methods and proofs. Not by any arbitrary rule of exclusion or admission, The eleventh article of the treaty stipulates for this when it provides that the adjustment of the claims before the commissioners shall be “according to the principles of justice, the laws of nations, and the stipulations of the treaty betwen the two parties of 27th October, 1795.” The treaty of 1795, in its 20th article, made provision for suits by the citizens or subjects of the one nation in the courts of the other, and gave full and liberal effect to the judgment or decrees entered in such cases. Provision was made in the 21st article of the same treaty for a mixed commission to adjudicate the claims of citizens of the United States against Spain.
These commissioners were to “be sworn impartially to examine and decide the claims in question according to the merits of the several cases, and to justice, equity, and the law of nations.” Power was conferred “to examine all-such persons as come before them on oath or affirmation, touching the complaints in question, and also to receive in evidence all written testimony, authenticated in such manner as they shall think proper to require or admit.” These were the rules by which it was intended the commission should be governed. They were such as were worthy of two great enlightened nations treating with each other, and settling their national disputes, and adjusting the claims of their citizens upon enlarged and liberal views of international justice and comity. Had they been permitted to control, the decree of the Junta would not have been excluded. If Spain’s indebtedness to Meade had been in'the form of treasury notes, or certificates of indebtedness issued by the financial department, it would certainly not have been necessary to show item by item the multifarious dealings which formed the consideration of them. His claim, covering a number of years of extensive commercial and monetary transactions with the government, in their unliquidated state, doubtless depended largely upon information in the archives of the Spanish government ; upon the testimony of officials; upon a knowledge of the habits and modes of transacting business in the various departments of the Spanish government; upon Spanish laws and customs — much of which it would be impossible to bring before a commission sitting at Washington, and of most of that which could be obtained the commissioners, from previous habits and training, would be but poorly prepared to judge aright. In adopting a different rule and excluding *275 the liquidation the commissioners committed an error which has been productive of great loss and hardship to the claimants.
Have we the right and power now to correct their mistake and render to the claimants what should have been awarded to his intestate forty-five years ago ? The claimant’s counsel contend that we have. They predicate it, first, upon the ground that the United States applied Meade’s claim, his private property, to public use, which gives him a claim to compensation outside and irrespective of the treaty. That from the moral and natural as well as constitutional obligations to make just compensation for property so taken, the law infers or super-adds a promise to pay its fair value. That upon such implied promise this action may be sustained and judgment given for the claimant. Such was the case of Grant v. The United States. (C. Cla. Rep., vol. 1, p. 41.)
The right of the government to take for public use or public welfare the property of a citizen by virtue of the right of eminent domain, and the obligation to make compensation to' the citizen for it, are universally admitted as concurrent and correlative powers and duties. They are coexistent and coextensive.
Was the release and cancellation of Meade’s claim against Spain such an appropriation of private property to public use as comes within the rule of law and the provision of the Constitution 1 The court think it was. A man’s choses in action, the debts due him, are as much property and as sacred in the eye of the law as are his houses and lands, his horses and his cattle. And when taken for the public good, or released or cancelled to secure an object of public importance, are-to he paid for in the same manner. In all such cases the right of the citizen and the obligation of the sovereign are perfect. The remedy is to be provided by the government. While the right cannot be destroyed, the remedy may be denied, or an inadequate one supplied. And here lies the difficulty in the claimant’s case. In a case where property has been so taken by the United States an action will lie, upon the implied promise, as is held in the Grant case cited above. But where a special mode of obtaining compensation is designated by the sovereign, or the power of assessing or deciding upon it is lodged in a particular tribunal, are not the ordinary means superseded 1 Must not the remedy designated be pursued alone ? Is not the jurisdiction of the special tribunal exclusive ? These questions, we think, must all be answered in the affirmative. Such is now in this country, and to a great extent also in England, the mode of determining the compensation of persons through or upon *276 whose lands public highways or other public easements have been authorized. And, so far as we know, these remedies have been held exclusive of the common law action or other modes of redress. (Mason v. The Kennebeck R. R. Co., 31 Me. Rep., 215; S. C., 1 Am. R’w’y Cases, 162; Stowell v. Flagg, 11 Mass., 364; 12 id., 446; Cushing v. Baldwin, 4 Wend., 667; The London and N. W. R’w’y Co. v. Bradley, 5 Eng. L. and Eq. Rep., 104; Knorr v. The Germantown R. R. Co., 5 Whart., 256; Rogers v. Bradshaw, 20 John., 735.) It is upon the principle cited in Dwarris on Stat., 641: “If an affirmative statute which is introductive of a new law direct a thing to be done in a certain manner, that thing shall not, even although there are no negative words, be done in any other manner.” (1 Am. Railway Cases, 206, 1 Fost., 359; Bloodgood v. The M. and H. R. Co., 14 Wend., 51; Beekman v. Saratoga and Sch. R. Co., 3 Paige, 45, S. C., 2 Am. Railway Cases, 503.)
The doctrine and principles cases are in hand. By this treaty-, which has all the force and authority of an act of Congress, the claimant’s property is taken for and appropriated to the public use. Spain is released; all her obligation to the claimant is cancelled. By the same instrument it is transferred to, and and assumed by, the United States. But the mode, and manner of making compensation are prescribed by the same instrument. A special tribunal, with specific powers and special jurisdiction, is created to adjust and award that compensation. Can the person whose property has been taken resort to any other means, or sue in any other tribunal ? We think not. The case is still stronger against the claimants, that their case, the same claim, for the same identical money, was presented to that special tribunal. Their decision was made, and it is nothing to the purpose to say that it was erroneous. It is not for us, nor for any other court, to overturn or disregard that decision. No appeal was given, no power of revision lodged anywhere, in any person or tribunal, and their decision was therefore necessarily the conclusion of the whole matter. We are not left without precedent, and those of the highest authority, upon this great question. A case most closely resembling this in its principles and history, is that of De Bode v. Regina 3 Clarke’s Ho of Lords Rep., 449. The history of that case is succinctly as follows :
The Baron dé Bode was a British subject, of British birth, although of mixed parentage — French and English. In the middle of the last century he owned estates in that portion of France which in the'old books of history is called Alsace, on the lower Rhine. He owned a *277 baronial estate tliere, and held that estate at the opening of the French revolution. The estate was confiscated by the convention, and thus things remained until the peace of Paris, one of the conditions of which was, that all British subjects despoiled by France, in the interval between the commencement of the war of the French revolution and that treaty, should he indemnified out of a fund paid over to England by France. A commission was appointed to adjudicate in behalf of the various claimants; and the Baron de Bode, before that commission, presented his case, proved that he was a British subject* proved the confiscation, and claimed indemnity. The commissioners decided against him, by reason of ignorance of geography on their part. They conceived that Alsace was, in the reign of Louis XVI, a portion of Germany, not of France ; and therefore De Bode did not come within the treaty. Then he came to England, presented his petition of right, and failed on the ground that the act of parliament had so disposed of this money that the petition of right did not reach it..
The various reports of the case will be found in 6 Dowl. Prac. Cas., 776 ; 8 Q. B. Kep., 208, 285; 13 Q. B. Bep., 364; Id., 381.
So the Supreme Court of the United States in Comegys v. Vasse, 1 Pet., 212, where the effect of a finding by the commissioners under this very treaty came directly in question, held that the jurisdiction of the commissioners was exclusive and their award final and conclusive. Mr. Justice Story, in delivering the judgment of the court, after quoting the 11th article of the treaty, says : “ The object of the treaty was to invest the commissioners with full power and authority to receive, examine, and decide upon the amount and validity of the asserted claims upon Spain for damages and injuries. Their decision, within the scope of this authority, is conclusive and final. Tf they pronounce the claim valid or invalid, if they ascertain the amount, their award in the premises is not re-examinable ; the parties must abide by it as the decree of a competent tribunal of exclusive jurisdiction. A rejected claim cannot be brought again under review in any judicial tribunal. An amount once fixed is a final ascertainment of the damages or injury. This is the obvious purport of the language of the treaty.”
These precedents are so full and pointed, that in our judgment they authoritatively rule the case. However erroneous the decision; upon whatever mistakes of fact or of law it was based; whatever hardship or injustice it inflicts, give us no right and confer no power to re-open and re-examine the question. In our opinion, it is like any other matter that has been finally judicially decided by a competent *278 court. It closes tbe controversy; and however injured or dissatisfied any party may be, there can be no redress in any other tribunal.
The right and power of the United States to treat with Spain on the subject of Meade’s claims, and to release them under all the circumstances of this case, cannot well be denied. It may be that Mr. Meade had no right to call upon the United States beyond their own policy or convenience to interpose in his behalf. Nor could they, probably, without his consent have subj ected his claim to the terms and conditions of the treaty. But when he solicited their aid, and they did interpose at his instance and with his consent, I see no reason for the application of any other rules than obtain in cases that come legitimately within the range of national adjustment of private claims.
Mr. Adams in his communication to the President of February 13, 1821, expresses this aptly and correctly :
“ The claimant by contract cannot resort to the interposition of his own government to obtain from the other the satisfaction for his claims to the same extent as the claimant from wrong. The government of the claimant by contract can interpose in his behalf only by its good offices, and cannot, as the memorial states, press to the extent of reprisals for satisfaction of the claim. It has no right to interpose at all without the solicitation of the claimant himself, who, having staked his interest upon his own confidence in the government with which he contracts, may properly abide by the result of that confidence without calling upon his country to make itself a party to the demand. But if he does appeal to his own government for that adventitious aid to which other contractors with the same party and on the same security cannot resort, he thereby voluntarily makes his claim a subject of negotiation and of those compromised in which all national adjustments of individual claims must and do always consist.”
Nor do the facts in relation to the demand upon Spain for the documents and proofs called for by the commissioners, create any new and substantive cause of action cognizable by us. If done purposely and fraudulently by the officers of the government it would constitute a tort of which we have no jurisdiction, and for which the United States is not liable if we had. But we must presume that the delay was not from design to injure the claimant or to hinder him in the establishment of his claim. The fact, doubtless, is, that it was owing to the confusion incident to the wars in which Spain was then engaged, the blockade of her ports, and the removal of her public records and archives to places of safety from the invading armies. What the result would have been had the documents been obtained we cannot conjee- *279 ture. Whether the final decision of the commissioners would have been different it is impossible to know. And, therefore, any supposition we might make would he a most uncertain and insufficient basis to found a judgment upon. They had already discarded the only proofs upon which, we think, they could have based a correct, intelligent, and just award. When they attempted or proposed to go beyond that, it is hard to divine where or in what it might end. If the United States have ever made a bona fide effort to obtain the proofs, as we think they did, and failed from causes which they could not overcome or control, they are in nowise responsible for the failure.
The majority of the judges do not construe the joint resolution of Congress of 25th July, 1866, as indicating any intention to change the grounds or rule of decision, but merely to remove any doubts as to our jurisdiction. It seems to us that the particular object sought to be accomplished by sending the case back was to secure to the parties a judicial determination of the controversy under the enlarged powers and extended jurisdiction of this court, with the right of review by the Supreme Court of the United States. They would thus secure to the litigants the judgment of that high tribunal upon the important principles and questions involved. Should that judgment be other than ours, the full analysis and classification of the facts already made will relieve the case from much of the labor and consequent delay incident to the present trial.
In rendering judgment adverse to the claimants, we yiéld obedience to authorities which we cannot disregard. We feel most keenly the hardships that have attended and surrounded the case. The fruits of a laborious and successful life of a meritorious citizen, who honored the name of American merchant abroad, have been appropriated by the United States nearly fifty years ago. To this hour not a farthing’s compensation has been made. He long since died, struggling to obtain from his country some recognition of his claim. His faithful wife pursued the same object for a quarter of a century longer, with that hope deferred which makes the heart sick, until the grave closed over her labors and her disappointments. It has descended to their family, now rendered illustrious by the great and patriotic services of one of their sons, rendered to the country in the hour of her peril. That we cannot now award them what their father was justly entitled to forty-five years ago is to us a matter of sincere regret.
We therefore dismiss the petition and adjudge that the defendants go thereof without day.
Judge Peck concurs in this opinion.