Walter ABRAHIM–YOURI,
et al., Plaintiffs,

v.

The UNITED STATES, Defendant.

No. 95–299 C.

United States Court of Federal Claims.

Sept. 18, 1996.

Stephen M. Truitt, Pepper, Hamilton & Scheetz, Washington, D.C., for plaintiffs. Charles Carpenter, Pepper, Hamilton & Scheetz, Washington, D.C., John A. Westberg and Lewis M. Johnson, Westberg & Johnson, Washington, D.C., of counsel.

Rhonda K. Schnare, with whom were Assistant Attorney General Frank W. Hunger, Director David M. Cohen, Department of Justice, Washington, D.C., and Lisa Grosh, Department of State, and David Bradley, Foreign Claims Settlement Commission, for defendant.

## OPINION

WIESE, Judge.

Plaintiffs seek just compensation for an alleged taking of their property. The taking, they contend, was precipitated by a settlement agreement, executed between the United States and Iran, that resolved certain claims against Iran that were awaiting adjudication before a special claims tribunal. Plaintiffs' property interests were among those affected by this settlement agreement. Their contention is that the settlement agreement failed to secure the full amount of compensation due them from Iran for the property losses at issue. Plaintiffs see the claimed shortfall in compensation as a taking by the United States.

The case is now before the court on plaintiffs' motion for partial summary judgment and defendant's cross-motion for full summary judgment.[1] The matter has been fully briefed and oral argument was heard on July 31, 1996. We now decide in defendant's favor.

### Facts

On January 19, 1981, the United States of America and the Islamic Republic of Iran each gave formal approval to two declarations, drawn up by the Government of Algeria, setting forth principles and procedures for resolving a breach in relations then existing between the two signatory nations. These declarations, known generally as the Algiers Accords, brought to an end the crisis that had arisen between the United States and Iran as a result of the seizure of the United States Embassy and property in Tehran in November 1979 and the detention of United States diplomatic personnel in Iran following that seizure.

Among other matters, the declarations provided for the creation of an international

---

1. In an earlier round of this litigation, the court had before it plaintiffs' motion for class certification and defendant's partial motion to dismiss for lack of jurisdiction. Neither motion was granted. A ruling on the request for class certification was deferred to a later stage of the proceedings; the motion for partial dismissal was denied because it addressed issues not actually raised by the complaint.

arbitral tribunal, the Iran–United States Claims Tribunal (the Tribunal), to hear all claims against either country brought by nationals of the other arising "out of debts, contracts ... expropriations or other measures affecting property rights."[2] Such claims, it was specified, were to be presented to the Tribunal "either by claimants themselves or, in the case of claims less than $250,000, by the government of such national."[3] In addition to hearing claims by nationals of either country, the Tribunal was vested with jurisdiction to hear claims of either country against the other "arising out of contractual arrangements between them for the purchase and sale of goods and services."[4]

In the discharge of these functions, the Tribunal was directed to "decide all cases on the basis of respect for law, applying such choice of law rules and principles of commercial and international law as the Tribunal determines to be applicable, taking into account relevant usages of the trade, contract provisions and changed circumstances."[5]

The Tribunal was intended to serve as the exclusive forum for the litigation of the claims over which it was given jurisdiction. Consistent with that purpose, the United States agreed "to terminate all legal proceedings in United States courts involving claims of United States persons and institutions against Iran ... to nullify all attachments and judgments obtained therein, to prohibit all further litigation based on such claims, and to bring about the termination of such claims through binding arbitration."[6] Additionally, to insure payment of all Tribunal awards in favor of United States nationals,

the Accords provided for the establishment of an interest-bearing security account, initially to be funded with one billion dollars of blocked Iranian assets and thereafter to be maintained, through renewal deposits by Iran, at a minimum balance of $500 million.

Pursuant to the Accords, on April 1, 1981, the United States Department of State issued a public notice informing persons with claims against Iran amounting to less than $250,000 ("the small claims") to register their claims with the Department. Plaintiffs were among those individuals who registered claims in response to this notice. Thereafter, the Department of State submitted the small claims to the Tribunal; by January 19, 1982, some 2,782 small claims had been filed there.

Over the next several years, the United States and Iran directed their efforts to resolving the small claims. As of August 1989, however, only 82 small claims had been decided while over 2,200 small claims remained pending before the Tribunal.

In due course, the United States and Iran reached an agreement to settle the small claims of the United States nationals *en bloc*, along with a separate claim of the United States, for a total of $105,000,000. (The claim of the United States involved loans that had been extended to Iran by the United States Agency for International Development (A.I.D.)).[7] Claims of United States nationals involving amounts of $250,000 or more were unaffected by the agreement and consequently remained at the Tribunal for determination.

In return for payment to the United States of the lump-sum amount of $105,000,000, the settlement agreement provided for

---

2. Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran (Claims Settlement Declaration), January 19, 1981, art. II, 20 I.L.M. 223, 231 (1981).

3. *Id.*

4. *Id.*

5. *Id.* art. V.

6. Declaration of the Government of the Democratic and Popular Republic of Algeria (General Declaration), January 19, 1981, General Principles, ¶ B, 20 I.L.M. at 224.

7. The settlement agreement included not only those small claims of United States nationals filed with the Tribunal, but also small claims submitted to the State Department, which had not been filed with the Tribunal because the filing deadline had expired. The agreement also covered small claims that claimants had withdrawn from the Tribunal and claims that the Tribunal had dismissed for lack of jurisdiction.

espousal of the small claims by the United States,[8] extinguishment of the small claims and also the United States' claim against Iran, transfer to Iran (by quitclaim) of all property interests underlying the small claims, and referral of the small claims to the Foreign Claims Settlement Commission [9] for final evaluation and determination of amount. The agreement did not, however, specifically provide for allocation of the $105 million between the small claims and the Government's claim.

On June 22, 1990, the Tribunal ratified the settlement agreement and issued an award on agreed terms. Thus, on that date, the settlement agreement became effective. On June 28, 1990, the Department of State transferred all small claims to the Commission for adjudication. On July 12, 1990, the Department of State directed the Department of the Treasury to allocate $55 million of the settlement amount to the satisfaction of the United States' claim arising out of the A.I.D. loans and $50 million for payment of the small claims referred to the Commission.

The Commission concluded its adjudication of the small claims by February 1995. A total of 3,066 claims were resolved. Of that number, 1,000 were upheld. In contrast to the proceedings before the Tribunal, the determinations of the Commission were based almost entirely upon presentations made by the claimants; the Government of Iran was not a party to the proceedings before the Commission. However, pursuant to the terms of the Settlement Agreement, the Commission was able to obtain from Iran numerous documents relating to the small claims.

The successful claimants received awards together with simple interest—computed at approximately 10 percent—measured from the date of the wrongful act giving rise to Iran's liability until June 22, 1990, the effective date of the settlement agreement. Interest was neither computed nor awarded for the period after June 22, 1990. In all, the Commission entered awards with an aggregate total value of $41,570,936.31 in principal and $44,984,859.31 in interest. Thus, the $50 million allocated for the satisfaction of the small claims was insufficient to pay the successful claimants the full amount of their interest award. (After payment of principal, the balance remaining, supplemented by interest earned on the settlement funds while on deposit, resulted in each claimant receiving approximately 34.5 percent of the interest amount the Commission had determined.)

Plaintiffs are among those whose claims were upheld by the Commission. Their suit here is premised on the view that the settlement agreement effected a taking of their claims against Iran; consequently, they contend that the value of those claims (as established by the Commission) must include interest measured from the date of expropriation—the date of the wrongful act by Iran—until the date payment is actually received. In short, they seek not only the balance of the interest that the Commission had determined but also interest beyond the Commission's interest cut-off date of June 22, 1990.

### Discussion

In *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554

---

**8.** The "espousal" of a claim of a United States national by the United States occurs "when the government of the United States, usually through diplomatic channels, makes it the subject of a formal claim for reparation to be paid to the United States by the government of the state responsible for the injury." Restatement (Second) Foreign Relations Law of the United States § 211 cmt. b (1965).

**9.** The Foreign Claims Settlement Commission (formerly called the International Claims Commission) is an independent, adjudicatory body, responsible for deciding claims against foreign governments, referred for determination by Congress, that involve the expropriation of property belonging to the United States or its citizens. 22 U.S.C. §§ 1622, 1623 (1994). *See Dames & Moore v. Regan,* 453 U.S. 654, 680–81, 101 S.Ct. 2972, 2987–88, 69 L.Ed.2d 918 (1981) (discussing history of Foreign Claims Settlement Commission).

In 1985, the Foreign Claims Settlement Commission was given standby jurisdiction to adjudicate claims of United States nationals against Iran in the event a lump-sum settlement of those claims were to be concluded. Title V, Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub.L. No. 99–93, 99 Stat. 405, 437 (50 U.S.C. § 1701 note ("Iran Claims Settlement")).

(1960), the Supreme Court observed that the Fifth Amendment's guarantee that private property shall not be taken without the payment of just compensation "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Thus, the starting point for discussion here is whether the economic injury plaintiffs complain of—the alleged insufficiency of the interest payments they received—satisfies the requirements for a Fifth Amendment taking. In other words, is theirs a loss that in "all fairness and justice" ought to be shifted to the public rather than be shouldered by the plaintiffs alone?

■ Although there is no precise formula to rely on in determining the point at which Government interference with private property interests gives rise to a compensable taking, modern-day case law has adopted the use of a three-factor analysis in searching out an answer to the question. These factors, set forth in the Supreme Court's decision in *Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), include: the extent to which the Government's action interferes with investment-backed expectations, the character of the Government's action, and the economic impact of the Government's action on the claimants. These considerations are examined below.

■ In assessing the reasonableness of investment-backed expectations, the question we ask is whether plaintiffs reasonably could have anticipated that their property interests might be adversely affected by Government action. Where such intrusion is foreseeable, the commitment of private resources to the creation of property interests is deemed to have been undertaken with that risk in mind; hence, the call for just compensation on grounds of fairness and justice is considerably diminished. *See, e.g., Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 227, 106 S.Ct. 1018, 1027, 89 L.Ed.2d 166 (1986) ("Prudent employers ... had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional fi-

nancial obligations.") and *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1006, 104 S.Ct. 2862, 2874, 81 L.Ed.2d 815 (1984) ("Monsanto was on notice of the manner in which EPA was authorized to use and disclose any data turned over to it by an applicant for registration.").

■ Plaintiffs cannot lay claim to an investment-backed expectation free of the potential of Government involvement. Those who engage in international commerce do so in full awareness that the security of their enterprise is uniquely dependent on the maintenance of stability and good order in the relationships of the nations involved. Where those relationships become strained, the resulting frictions can adversely affect all subordinate interests since traditional remedies to the enforcement of rights may also have been rendered ineffectual. In that event, it is the hand of Government alone that can help restore the mutual amity upon which successful commerce depends. Since the observance of good order among nations can never be taken for granted, the potential for Government involvement in international commerce remains an ever-present fact of life for those who transact their business abroad. *Chang v. United States*, 859 F.2d 893, 897 (Fed.Cir.1988). Plaintiffs are charged with knowledge of this reality.

■ Moving on to the next factor—the character of the Government's actions—we note at once that, in the conduct of foreign relations, the President has the indisputable power to take up and to settle the claims of American citizens against foreign states and nationals. *United States v. Pink*, 315 U.S. 203, 240, 62 S.Ct. 552, 570, 86 L.Ed. 796 (1942) (Frankfurter, J., concurring). Elaborating on this theme, the court in *Shanghai Power Co. v. United States*, 4 Cl.Ct. 237, 244 (1983), *aff'd without opinion*, 765 F.2d 159, *cert. denied*, 474 U.S. 909, 106 S.Ct. 279, 88 L.Ed.2d 243 (1985), explained:

> When tensions arise between our nation and another, those caught in the middle must rely upon the President to safeguard their lives and property to the greatest extent possible. This may mean that others who have claims against the foreign sovereign may be blocked from seeking to

collect their debts so that international tensions will not be exacerbated. Yet, in times of emergency, it is frequently entirely fortuitous who will benefit and who will suffer from any such presidential action. The possibility that the President will intervene in this manner is properly recognized as both a shared benefit and a shared risk of those who trade and travel abroad. [footnote omitted].

■ The espousal of plaintiffs' claims, like the circumstances that generated the necessity for that action, are eventualities whose risks of occurrence plaintiffs are deemed to have assumed by virtue of their choice to engage in foreign commerce.

■ The last factor we consider is the economic impact of the Government's actions. As noted earlier, plaintiffs base their demand to just compensation on the premise that their claims for property losses were settled for an inadequate amount. They contend that, absent the settlement, their claims would have proceeded to an adjudication before the Tribunal and there—the argument continues—plaintiffs would have recovered the principal amount (which, in fact, they did receive) as well as interest measured from the date of taking until the date payment was actually received.[10] (Of this latter amount, approximately 35 percent was recovered.)

■ There are two responses to plaintiffs' argument. First, and foremost, the argument relies on an erroneous comparison. The property losses that plaintiffs suffered were occasioned by Iran, not the United States. Hence, the question that needs to be asked is whether the settlement provided plaintiffs with any lesser amount than they could have recovered from Iran absent intervention on their behalf by the United States.

Significantly, there is nothing in the record to suggest that plaintiffs would have fared as well, much less better, had they been forced to go it alone.

The other point to be made here is that plaintiffs' failure to obtain interest in the full amount claimed does not force upon them an extraordinary or unusual loss. To view the issue in another context, the rule has long prevailed that interest is not collectible on a debt due from the United States in the absence of an authorizing statute or contract term. Until the advent of the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1994), this rule governed the allowance of contractor claims against the sovereign, *United States v. Thayer–West Point Hotel Co.*, 329 U.S. 585, 588, 67 S.Ct. 398, 399–400, 91 L.Ed. 521 (1947); in other areas it remains the controlling rule. *See e.g., Getty Oil Co. v. United States*, 767 F.2d 886 (Fed. Cir.1985). Evaluated in light of this background, the court sees no compelling reason to view the alleged shortfall in plaintiffs' interest recovery as a burden which, in fairness and justice, should be allocated to the public as a whole.

### *Conclusion*

Having considered the factors pertinent to our inquiry, the court is left with the certain conclusion that the events that befell plaintiffs were part of the risks they assumed in choosing to do business abroad. Accordingly, no principle of justice would support allocation to the public of the losses plaintiffs have claimed. In short, there was no taking of plaintiffs' property.

Based on the foregoing, plaintiffs' motion for partial summary judgment is denied and

10. In the presentation of their case, plaintiffs make the argument that the settlement agreement amounted to a *per se* taking of their property. The argument reflects a misconception of law. A *per se* taking involves a displacement, by Government action, of the incidents of property ownership so complete in its character as to leave an owner without any possessory interests in the property. Examples include a permanent physical occupation of property by the Government, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 441, 102 S.Ct. 3164, 3179, 73 L.Ed.2d 868 (1982) or a regulation that

categorically prohibits *all* economically beneficial use of land thereby destroying its value for private ownership, *see Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1015, 112 S.Ct. 2886, 2893, 120 L.Ed.2d 798 (1992). We encounter neither of such extremes in this case. Indeed, as the Supreme Court noted in *United States v. Sperry Corp.*, 493 U.S. 52, 62 n. 9, 110 S.Ct. 387, 395 n. 9, 107 L.Ed.2d 290 (1989), "[i]t is artificial to view deductions of a percentage of a monetary award as physical appropriations of property." The same is true here.

defendant's cross-motion for summary judgment is granted. The Clerk is directed to enter judgment dismissing the complaint.