Walter ABRAHIM–YOURI, Emanuel Ar-
yeh, Ouriel Aryeh, Mehrdad Azarmi,
Jalil Fardanesh, Delta Geotechnical
Consultants, Clifford F. Gurney, David
Laylin, Odsiran Meteorological Systems,
Inc., Robert L. Rutz, Jean Bijan Sami-
my, M.D., Carolyn D. Spatta, University
of Northern Colorado, Richard C. Will-
son, Jr., Dara Zargar, Lockwood Green
International, Inc., Nouriel Arteg, Sam-
uel Aryeh, Bahman Maalizadeh, Odsi-
ran Data Systems, Inc., Lina Z. Samimy,
M.D. and University of Pittsburgh,
Plaintiffs–Appellants,

v.

The UNITED STATES, Defendant–
Appellee.

No. 97–5011.

United States Court of Appeals,
Federal Circuit

Dec. 4, 1997.

Stephen M. Truitt, Pepper, Hamilton & Scheetz, of Washington, DC, argued for plaintiffs-appellants. With him on the brief were Charles H. Carpenter. Also on the brief were John A. Westberg, and Lewis M. Johnson, Westberg & Johnson, of Washington, DC.

John C. Erickson, III, Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for the defendant-appellee. With him on the brief were Frank W. Hunger, Assistant At-

torney General, and David M. Cohen, Director.

Before MICHEL, PLAGER and CLEVENGER, Circuit Judges.

PLAGER, Circuit Judge.

Plaintiffs-Appellants ("plaintiffs") appeal from a Court of Federal Claims decision, *Abrahim–Youri v. United States,* 36 Fed.Cl. 482 (1996), granting summary judgment to the United States. Plaintiffs filed suit for "just compensation" for an alleged taking[1] of property that occurred when the United States ("Government") espoused[2] and settled their claims against the government of Iran. Because no compensable taking occurred, we affirm the Court of Federal Claims' decision.

## BACKGROUND

On November 4, 1979, the American Embassy in Tehran, Iran was seized and American personnel were taken hostage. In response, President Carter signed Executive Orders blocking transfers of property of Iran, which had the effect of "freezing" billions of dollars of American-controlled Iranian assets.

The "hostage crisis" resulted subsequently in a wide variety of claims of U.S. nationals against Iran. On January 19, 1981, the United States and Iran entered into a series of agreements, including two declarations of the government of Algeria, the "General Declaration"[3] and the "Claims Settlement Declaration,"[4] negotiated as part of the ultimate resolution of the hostage crisis. The agreements, known as the "Algiers Accords," provided for the release of the hostages, the return of assets to Iran, the termination of certain litigation against Iran in U.S. courts, and the establishment of the Iran–United

---

1. "[N]or shall private property be taken for public use, without just compensation." U.S. Const. amend V.

2. "A claim is espoused by the United States ... when the government of the United States, usually through diplomatic channels, makes it the subject of a formal claim for reparation to be paid to the United States by the government of the state responsible for the injury." Restatement (Second) of Foreign Relations Law of the United States § 211 cmt. b (1965).

3. Declaration of the Government of the Democratic and Popular Republic of Algeria, Jan. 19, 1981, 20 I.L.M. 223.

4. Declaration of the Government of the Democratic and Popular Republic of Algeria Concerning the Settlement of Claims by the Government of the United States of America and the Government of the Islamic Republic of Iran, Jan. 19, 1981, 20 I.L.M. 223, 230.

States Claims Tribunal ("Tribunal") to resolve certain outstanding claims. The Algiers Accords, and the series of Executive Orders that implemented them, were challenged and subsequently upheld by the Supreme Court in *Dames & Moore v. Regan,* 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981). *See generally* Shlomo Cohen et al., Notes, *The Iranian Hostage Agreement Under International and United States Law,* 81 Colum.L.Rev. 822 (1981).

Article II(1) of the Claims Settlement Declaration gave the Tribunal jurisdiction to hear all claims against either country brought by nationals of the other, arising "out of debts, contracts ..., expropriations or other measures affecting property rights," as well as certain government-to-government disputes. Claims of U.S. nationals of less than $250,000 ("small claims") were to be presented to the Tribunal by the United States Government. To ensure payment of Tribunal awards in favor of U.S. nationals, the General Declaration provided for an interest-bearing security account, initially funded with one billion dollars of Iranian assets, and thereafter to be maintained, through deposits by Iran, at a minimum balance of $500 million.

Over the next several years, the United States and Iran continued negotiations in an effort to resolve the small claims of U.S. nationals and certain claims of the United States. In 1985, Congress passed legislation giving the Foreign Claims Settlement Commission ("Commission") standby jurisdiction to adjudicate claims of U.S. nationals against Iran in the event that the two governments concluded a lump-sum settlement of claims.[5] As of August 1989, only 82 small claims had been decided, while over 2,200 small claims remained pending before the Tribunal.

On May 13, 1990, the United States and Iran reached an agreement to settle the small claims of the U.S. nationals, along with a separate claim of the United States, for a total of $105 million.[6] Claims of U.S. nationals involving $250,000 or more were unaffected by this agreement and remained pending at the Tribunal. In return for the payment of $105 million, the Settlement Agreement provided for espousal of the small claims by the United States, extinguishment of the small claims and the United States' claim against Iran, transfer to Iran (by quitclaim) of all property interests underlying the small claims, and referral of the small claims to the Commission for final evaluation and determination of amount. On June 22, 1990, the Settlement Agreement became effective when the Tribunal accepted the agreement and issued an award on agreed terms. The State Department then transferred all of the small claims to the Commission for adjudication. The Government allocated $55 million of the settlement amount for its own claim, and $50 million for payment of the small claims referred to the Commission.

The Commission concluded its adjudication of the small claims by February 1995. The proceedings held before the Commission were ex parte; Iran was not a party to the proceedings, but did provide numerous documents to the Commission. A total of 3,066 claims[7] were resolved, and 1,000 of the claims were upheld. The successful claimants received awards plus interest, measured from the date of Iran's wrongful act until June 22, 1990, the effective date of the Settlement Agreement. Interest was not awarded for the period after June 22, 1990. In all, the Commission entered awards with an aggregate total value of $41,570,936 in principal and $44,984,859 in interest. Consequently, the $50 million allocated for the small claims (together with the interest borne on that sum) was insufficient to pay the successful claimants the full amount of their interest awards. Each claimant received the full amount of the principal awarded by the Commission and approximately

---

**5.** Foreign Relations Authorization Act, Fiscal Years 1986 and 1987, Pub.L. No. 99–93, Title V, 99 Stat. 405, 437 (1985) (codified at 50 U.S.C. § 1701 note (1994) ("Iran Claims Settlement")).

**6.** Settlement Agreement in Claims of Less than $250,000, Case No. 86 and Case No. B38 ("Settlement Agreement").

**7.** The Settlement Agreement included a number of claims that had not been pending before the Tribunal, such as those that had been filed with the State Department but not filed with the Tribunal due to an expired filing deadline. *Abrahim–Youri,* 36 Fed.Cl. at 484 n. 7.

34.5 percent of the interest computed by the Commission.

Plaintiffs' claims were among those upheld by the Commission. After the United States and Iran entered into the Settlement Agreement, plaintiffs filed suit in the Court of Federal Claims, taking the position that the action of the United States in espousing and settling their claims was a taking for which the Fifth Amendment requires just compensation. They seek the payment of interest on the judgment awarded by the Commission, both the balance of the amount computed by the Commission and interest beyond the interest cutoff date of June 22, 1990.

The trial court evaluated plaintiffs' takings claims under the three-factor test enunciated by the Supreme Court in *Penn Central Transportation Co. v. New York*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). With regard to the investment-backed expectations factor, the court noted that "[t]hose who engage in international commerce do so in full awareness that the security of their enterprise is uniquely dependent on the maintenance of stability and good order in the relationships of the nations involved.... [;] the potential for Government involvement in international commerce remains an ever-present fact of life for those who transact their business abroad." *Abrahim–Youri*, 36 Fed.Cl. at 486. The court charged plaintiffs with knowledge of this reality.

The court went on to consider the other two factors as well. The character of the Government's action—the espousal—was deemed to be consistent with the conduct of foreign relations by the President and with the circumstances of the case. *Id.* at 486–87. The third factor, the economic impact, was seen as resulting from the actions of Iran, rather than the United States, and the failure to obtain the full amount of the interest was not an extraordinary or unusual loss requiring governmental recompense. *Id.* at 487.

In light of this analysis, the trial court concluded that no compensable taking occurred and granted summary judgment to the United States. *Id.* at 487–88. This appeal followed.

## DISCUSSION

On appeal, plaintiffs argue that the trial court's view of the case under its *Penn Central* analysis is flawed in several respects, but more to the point, argues plaintiffs, the *Penn Central* type analysis is wholly inapplicable. This, according to plaintiffs, is because the Government effected a "per se" taking of their property (i.e., their causes of action against Iran) by espousing and settling their claims, which were pending before the Tribunal, and the Court of Federal Claims therefore erred in applying the three-factor *Penn Central* analysis which applies to regulatory takings, not to "per se" takings.

Seen as a "per se" taking, that is, one in which the plaintiffs' property was actually seized and became the property of the Government, the outcome, according to plaintiffs, is dictated by a straightforward syllogism: "[s]ince the existence of the property, the government action effectuating the taking, and the underpayment were all uncontroverted, summary judgment should have been granted to plaintiffs on the liability issue."

It is true that there are important analytical differences that must be respected between a claim for a taking based on a regulatory imposition that constrains an owner's continuing use of property, and one that is based on an outright governmental seizure or occupation of private property. The former is referred to as a "regulatory" taking; the latter as a "physical" (sometimes "per se") taking. The Supreme Court has made it clear that these two different fact patterns call for two different analytical approaches. *Compare Penn Central*, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, *with Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). *See Hendler v. United States*, 952 F.2d 1364, 1371–74 (Fed.Cir.1991) (discussing the differences in fact patterns and analyses).

We agree with plaintiffs that their property rights—their choses in action against Iran—were extinguished when the Government espoused and settled their claims. After the espousal by the United States, the choses in action were not simply regulated in some manner, but were terminated; plaintiffs no longer had claims against Iran, but

instead had a claim against the fund to be allocated by the Commission. In that sense plaintiffs are correct that this fact pattern does not fit comfortably in the regulatory taking category, the category to which the *Penn Central* analysis traditionally applies.

To say that, however, does not say that plaintiffs' syllogism necessarily follows, or that the considerations identified by the trial court are not relevant to the proper outcome in the case.[8] Since the reemergence of Fifth Amendment takings law from its long Twentieth-century slumber, *see Hendler,* 952 F.2d at 1371–74, takings claims have come in a variety of forms arising from a variety of fact patterns, some of which fit less than comfortably into the regulatory or physical takings dichotomy. *See, e.g., Board of County Supervisors v. United States,* 48 F.3d 520 (Fed. Cir.1995) (claiming, *inter alia,* a taking of a developer's "proffers"); *Richmond, Fredericksburg & Potomac R.R. Co. v. United States,* 75 F.3d 648 (Fed.Cir.1996) (claiming, *inter alia,* that public's assertion of its alleged rights by the Government constituted a taking); *Longshore v. United States,* 77 F.3d 440 (Fed.Cir.) (claiming that imposition of a fee for applying for a cellular radio license was a taking), *cert. denied,* —— U.S. ——, 117 S.Ct. 52, 136 L.Ed.2d 15 (1996).

In *Belk v. United States,* 858 F.2d 706 (Fed.Cir.1988), plaintiffs were individuals who had been held hostage in the U.S. Embassy in Tehran, Iran.[9] The former hostages alleged that the Government took their property—their causes of action against Iran—by entering into the Algiers Accords with Iran, which extinguished their claims against Iran and secured their release from captivity. The court noted that "[t]he President's action in implementing the Algiers Accords was primarily designed to benefit the hostages." *Id.* at 709. The court concluded that the Fifth Amendment did not require that compensation be paid the hostages because the hostages were the intended beneficiaries of the Government's action, although the action also incidentally benefited the American public. *Id.* at 709–10.

Plaintiffs here allege that a taking occurred, not when the Government entered into the Algiers Accords, but when the Government entered into the Settlement Agreement which espoused and settled their claims against Iran. As noted above, when the United States and Iran entered into the Settlement Agreement, approximately 2,200 small claims had been pending before the Tribunal for nine years, while only approximately eighty small claims had been settled. As a result of the Settlement Agreement, all of the small claims were referred to the Commission for evaluation. Each of the plaintiffs was paid in full the principal amount the Commission determined as the value of the claim, plus a portion of the interest due on the claim.

In contrast to the claimants who had claims greater than $250,000, the Government represented the plaintiffs at the Tribunal, and negotiated a settlement with Iran for the small claimants on the best terms it could. Interestingly, "a great many" of the claims greater than $250,000 were also settled in an *en bloc* negotiated settlement. Lawrence W. Newman, *A Personal History of Claims Arising Out of the Iranian Revolution,* 27 N.Y.U.J. Int'l L. & Pol. 631, 643 (1995). Many claims are still pending before the Tribunal, and the remaining private claimants do not have the benefit of free representation by the Government. *See id.* at 644 ("The current pace in the Tribunal is slow. Hearings are few and far between and the Iranians appear to want things that way.").

Plaintiffs do not object to the valuation of their claims by the Commission. They argue that a taking occurred because the Settlement Agreement failed to provide for a complete payment of the *interest* on their claims. They argue that *Belk* is distinguishable because the small claimants were "profoundly discriminated against by the Settlement Agreement in comparison to the Large Claimants who, to this day, collect interest to the date of payment of their awards.... In

---

**8.** *See generally* Note, *The U.S.–Iran Accords and the Taking Clause of the Fifth Amendment,* 68 Va.L.Rev. 1537 (1982) (discussing various factors that may be relevant to deciding whether compensation is warranted).

**9.** Two of the 15 plaintiffs were wives of hostages.

sum the Settlement Agreement was a disaster for the Small Claimants, unless they prevail here."

We disagree with plaintiffs' assessment of the Settlement Agreement. The Settlement Agreement was entered into by the Government in an effort to resolve what had become a problem for the small claimants as well as for the Government, not to harm them or to gain a government benefit at their expense.

> [W]here, as here, the private party is the particular intended beneficiary of the governmental activity, "fairness and justice" do not require that losses which may result from that activity "be borne by the public as a whole," even though the activity may also be intended incidentally to benefit the public.

*Belk,* 858 F.2d at 709 (quoting *National Board of Young Men's Christian Ass'ns v. United States,* 395 U.S. 85, 92, 89 S.Ct. 1511, 1515–16, 23 L.Ed.2d 117 (1969)). The fact that the Government also benefited from the Settlement Agreement (by settling a claim against Iran for $55 million) does not change the fact that the small claimants were substantially benefited as well.

Plaintiffs rely on *Meade v. United States,* 2 Ct.Cl. 224 (1866), *aff'd,* 76 U.S. (9 Wall.) 691, 19 L.Ed. 687 (1869), and *Gray v. United States,* 21 Ct.Cl. 340 (1886), for the proposition that extinguishment of a claim against a foreign government may be a compensable taking under the Fifth Amendment.[10] In *Meade,* plaintiff filed suit in the Court of Claims for an alleged taking by the United States of his claim against the government of Spain, which he alleged was espoused by the United States as part of the 1819 treaty between the United States and Spain. The court opined that extinguishment of a cause of action may be a compensable taking under the Fifth Amendment, but that Meade had no claim against the United States since under the treaty his exclusive remedy was before a special tribunal which had been set up to pay compensation for claims extinguished by the treaty. *Meade,* 2 Ct.Cl. at 275. The court held that, while in its opinion the tribunal erred in denying Meade's claim

on the ground that his proof was insufficient, Meade had not appealed the tribunal's decision and the court had no power to reopen the matter. *Id.* at 263, 276–78.

*Gray* is a Court of Claims advisory opinion to Congress in one of the so-called "French Spoliation Cases," dealing with relations between the United States and the revolutionary French Government between the time of the execution of King Louis XVI and 1801. The opinion, reported at 21 Ct.Cl. 340, runs some sixty-five pages, in the course of which the court opined that "the citizen whose property is thus sacrificed for the safety and welfare of his country has his claim against that country; he has a right to compensation, which exists even if no remedy in the courts or elsewhere be given him." *Id.* at 392–93. At the end of the opinion the court noted, "[w]e have been required not to investigate legal rights, based upon the doctrines and principles of the common law, but to inquire into and to report upon the ethical rights of a citizen against his Government; rights which are never enforceable except by the consent of the sovereign . . . ." *Id.* at 406. No judgment or order as such was rendered.

Plaintiffs argue that the Court of Claims' statements in *Meade* and *Gray* apply in this case, and that the Tucker Act, 28 U.S.C. § 1491(a)(1) (1994), now provides a remedy for these Fifth Amendment takings. We are not persuaded. For one, in neither *Meade* nor *Gray* were plaintiffs awarded a recovery. Thus the cited statements are dicta, and not binding law. For another, even if *Meade* and *Gray* correctly state propositions of law applicable to the circumstances of those cases at that time, the evolution of takings law in the last 100 years brings additional considerations to light.

In *Lucas v. South Carolina Coastal Council,* 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the Supreme Court stated that the range of interests that qualify for protection as "property" under the Fifth Amendment are defined by existing rules or understandings that stem from an independent source such as state law. *Id.* at 1030,

---

10. The Government, in its response brief, did not favor us with its views regarding plaintiffs' reliance on these cases.

112 S.Ct. at 2901. In that case the Court was considering the extent to which a regulatory imposition could prohibit development of the plaintiff's real estate. The Court held that background principles, there the state's basic nuisance law, defined the scope of the property right; if the reach of the regulation was coincident with the scope of the state's power to control nuisances, a power that inhered in all land titles, then no compensation would be due. *Id.*[11]

By like token, it does not strain *Lucas* beyond its intended purpose to recognize that a similar principle may apply to "property" that arises through consensual international transactions as it does to property interests created by domestic law. Certain sticks in the bundle of rights that are property are subject to constraint by government, as part of the bargain through which the citizen otherwise has the benefit of government enforcement of property rights. As the trial court correctly observed, those who engage in international commerce must be aware that international relations sometimes become strained, and that governments engage in a variety of activities designed to maintain a degree of international amity.

Here, though the choses in action were extinguished, the Government provided an alternative tailored to the circumstances which produced a result as favorable to plaintiffs as could reasonably be expected. Plaintiffs have not shown that they sustained losses that were avoidable under the circumstances. Nor have they shown that those engaged in international transactions with Iran could not have anticipated the need for government intervention. A history of such interventions can been seen in *Meade* and *Gray.*[12] A compensable taking has not been established; the fact that plaintiffs are not satisfied with the settlement negotiated by the Government on their behalf does not entitle them to compensation by the United States.

**11.** *Cf. Florida Rock Indus. v. United States,* 18 F.3d 1560, 1570–71 (Fed.Cir.1994) (drawing the distinction between mere diminution resulting from shared participation in government action and compensable taking).

## CONCLUSION

Accordingly, we affirm the decision of the Court of Federal Claims.

*AFFIRMED.*

CLEVENGER, *Circuit Judge,* joining the opinion of the court.

I join the opinion of the court. I write separately to emphasize the significance of this case, and to explain why I think the court's analysis and result is correct.

This case is significant in that it affords us the opportunity to recognize that the familiar per se taking and regulatory taking categories are not rigid, and that certain "per se" takings (i.e., those which involve a property owner being ousted from his property by government action—such as in this case) do not automatically result under the Fifth Amendment in compensation to the ousted property owner. In such instances, whether or not the taking will require compensation depends on consideration of factors which are more familiarly applied in the regulatory takings setting, where property owners who remain in possession of their property complain of devaluation of the property as a result of governmental action. The familiar factors assessed to determine if a regulatory taking is compensable in essence articulate a rule of reason which attempts to resolve the collision of private expectations and the public interests asserted in support of the regulation.

The situation presented by this case is not entirely new to us. For example, we have held that the owners of a banking institution cannot prevail with a Fifth Amendment per se takings claim based on the seizure of their bank by federal banking regulators in the course of exercising their statutory duties to ensure the viability of the banking system. *See California Hous. Sec., Inc. v. United States,* 959 F.2d 955 (Fed.Cir.1992). In that case, the actions of the federal government resulted in no less an occupation of the plaintiffs' property than occurred when the gov-

**12.** *See also Chang v. United States,* 859 F.2d 893, 897 (Fed.Cir.1988) (noting the foreseeability of government interference in international commerce); *767 Third Avenue Assoc. v. United States,* 48 F.3d 1575, 1580–81 (Fed.Cir.1995) (same).

ernment stepped into the shoes of the plaintiffs in this case, occupying, by espousal, their claims against Iran. Our decision in *California Housing* turned on the lack of any conceivable expectation by the plaintiffs that their property would not be occupied in the event circumstances compelled the regulators to close the facility. The license to engage in domestic banking in effect was subject to the condition of potential occupation of the private property by the government. That situation, we noted, is a far remove from the facts in *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982). In *Loretto,* the owner of a personal residence objected to installation by the government of cable television facilities on her property. For the Supreme Court, those facts invoked

> the traditional rule that a permanent physical occupation of property is a taking. In such a case, the property owner entertains a historically rooted expectation of compensation, and the character of the invasion is qualitatively more intrusive than perhaps any other category of property regulation.

*Id.* at 441, 102 S.Ct. at 3179. In my view, the plaintiffs in this case are also at a far remove from the plaintiff in *Loretto,* and can be viewed to have engaged in international commerce, here in Iran, pursuant to an implied license. For the longest time, the Congress has regulated the participation by U.S. citizens in international commerce. The fundamental right to travel, necessary to find value in any form of international commerce, is subject to regulation, in peace time, as well as in times of war. The circumstances in which currency can be moved in international commerce is likewise regulated. I need not attempt to exhaust the list of factors related to international commerce on which there have been long-standing, and unchallenged, federal regulations.

When one ventures into international commerce, it is with the knowledge of the extent to which that marketplace is regulated, and with appreciation for the reasons which underly such regulation, including the overriding need to enforce this nation's foreign policy. Indeed, many of the legal regulations pertaining to international commerce exist to benefit those who participate in that market.

One who obtains, in the pursuit of international commerce, a claim against a foreign government knows that our government may deem it necessary to espouse that claim. In my view, the fact of espousal alone cannot prove the existence of a compensable taking. For that reason, the cause of the plaintiffs in this case must fail.

Just as the seizure of a failing bank may be deemed necessary to implement the safety of our banking system, espousal of one's claim may be necessary to effect the consistent application of valid governmental policies in the international arena. In each instance, the property owner has been ousted of its property, and the federal government has occupied that property for the benefit of the larger public. A per se taking has occurred, but the taking by espousal is not automatically compensable, because no rational international commerce plaintiff could unblushingly assert shock or surprise that its property was seized by espousal.

Some property interests carry with them the right to full use and complete enjoyment without any interference by occupation from the government. Implicit in that right is the expectation that if the government interferes by occupation, it will compensate. Ms. Loretto held such a property interest. Other property interests carry with them stated or implied conditions that less than full use and enjoyment is to be expected, and that governmental interference by occupation may or may not be compensable, depending on the circumstances of the governmental action. Even in international commerce, there surely are some property interests as to which the owner shares Ms. Loretto's expectations. The plaintiffs in this case, however, have made no attempt to demonstrate such expectations, beyond their bare assertion that every physical occupation *must result in compensation.* Furthermore, there may be instances in which the governmental interests in espousal are so weak, or otherwise in question, that an espoused plaintiff may successfully show, in a rule of reason analysis, entitlement to compensation. In this case, however, for the reasons articulated in the opinion of the Court of

Federal Claims, and in the opinion of this court, the takings are not compensable.